UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RANDY WIECKHORST,

       Plaintiff,                                            Hon. Janet T. Neff

v.                                                                Case No. 1:10-CV-204

HARRIET SQUIRE, et al.,

       Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on <u>PHS Defendants' Motion for Summary Judgment</u>. (Dkt. #28). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **granted** and this matter terminated.

## BACKGROUND

Plaintiff initiated this action on February 26, 2010, against the following individuals: (1) Dr. Harriet Squier; (2) Dr. Scott Holmes; (3) Dr. Jeffery Stieve; (4) Valorie Hammond, N.P.; (5) Ann Karp; (6) Terrie Grubaugh; and (7) Ken McKee. The following allegations are contained in Plaintiff's Complaint.

In May 2007, Plaintiff injured his back. In October 2008, Dr. Marquart informed Plaintiff that "the only way to relieve the pain and to repair [his] back was to perform surgery." Before surgery could be accomplished, however, Plaintiff was hospitalized to treat cellulitis in his leg. As a result, Plaintiff's back surgery was "put on hold." On or about July 1, 2009, Plaintiff asked Defendant

Holmes to reschedule his back surgery. Holmes told Plaintiff that surgery was not necessary and that his back condition would improve with time and exercise. Plaintiff's back condition did not improve, however. Plaintiff later discussed the matter with Defendant Hammond, a nurse, who told Plaintiff that he was experiencing "a mild disc problem." She also told Plaintiff that "the doctor is right, it will get better with time and that [he does not] need surgery." On October 14, 2009, Defendant Hammond informed Plaintiff that Defendant Holmes had requested authorization to perform surgery, but that such was denied by Defendant Squier.

Plaintiff asserts that the failure to provide him with needed back surgery constitutes a violation of his Eighth Amendment rights. Plaintiff's claims against Defendants Grubaugh and McKee were dismissed on screening for failure to state a claim. Plaintiff's claims against Defendants Stieve and Karp were later dismissed as well. Defendants Squier, Holmes, and Hammond now move for summary judgment.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to

show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## **ANALYSIS**

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and

are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle*, 429 U.S. at 101-02. Accordingly, the Eighth Amendment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001).

The analysis by which a defendant's conduct is evaluated consists of two-steps. First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious. In this respect, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

When evaluating the objective prong of this analysis, the Court must first determine whether the alleged injury or medical need is "obvious," i.e., "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004); *see also, Cain v. Irvin*, 286 Fed. Appx. 920, 927 (6th Cir., July 17, 2008). If the injury or medical need is obvious, the question becomes whether the plaintiff received treatment "within a reasonable time." *See Blackmore*, 390 F.3d at 899-900 (where the plaintiff's injury or medical need is obvious, he satisfies the objective prong of the analysis by demonstrating that "he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame"). If, on the other hand, the injury or medical need is not obvious, the plaintiff must submit "medical evidence" demonstrating that the delay or denial of treatment "resulted in additional injury." *Id.*

If the objective test is met, the Court must then determine whether the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

In other words, Plaintiff must establish that the defendant "actually knew" that he "faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it." *Howard v. Calhoun County*, 148 F.Supp.2d 883, 888-89 (W.D. Mich. 2001) (citing *Farmer*, 511 U.S. at 847).

Plaintiff may disagree with Defendants' treatment decisions and, furthermore, may even consider such decisions to constitute negligence. To the extent, however, that Plaintiff merely disagrees with the treatment he received, or asserts that he received negligent care, Defendants are entitled to summary judgment. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)) ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing *Estelle*, 429 U.S. at 106) ("allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment); *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010) (to prevail on an Eighth Amendment denial of medical treatment claim, "the inmate must show more than negligence or the misdiagnosis of an ailment"); *Robbins v. Black*, 351 Fed. Appx. 58, 62 (6th Cir., Nov. 3, 2009) ("mere negligence or malpractice is insufficient to establish an Eighth Amendment violation").

The evidence submitted by the parties reveals the following. On September 22, 2008, Plaintiff participated in an MRI examination of his lumbar spine, the results of which revealed: (1) a

"very large" left-sided disc extrusion at L4-5; (2) a disc protrusion at L5-S1; (3) congenitally slender lumbar spinal canal; and (4) disc bulges at L2-3 and L3-4. (Dkt. #33, Exhibit A). Treatment notes dated October 15, 2008, indicate that Plaintiff's pain was being treated with Ultram and Neurontin. That same day, Dr. Christopher Marquart recommended that Plaintiff undergo "a microlumbar discectomy to remove the [L4-5] disc [and] decompress the nerve." Dr. Marquart noted, however, that Plaintiff "has a history of fluid retention due to IV drug use." Accordingly, Plaintiff would "need medical clearance because of the severe edema to make absolutely certain he doesn't have any unrecognized heart failure, renal or hepatic disease that would cause fluid retention." *Id.*

Treatment notes dated January 22, 2009, indicate that Plaintiff's care providers "are awaiting test results at this time" and that Plaintiff's "surgery will be scheduled if and when he ha[s] clearance from the cardiologist." (Dkt. #28, Exhibit D at 513[1]). On February 8, 2009, Plaintiff was transported to an emergency room after experiencing "severe pain" in his right groin and swelling in his right lower leg. *Id.* at 517. Plaintiff was admitted to the hospital where he was diagnosed with "severe" cellulitis[2] of the right lower extremity. *Id.* at 517-27, 542. Plaintiff was hospitalized until March 2, 2009. *Id.* at 531-42.

On March 5, 2009, Plaintiff reported to Health Services that his right leg "has gotten suddenly worse." *Id.* at 545, 550. An examination revealed that Plaintiff's right lower extremity was "1/3 larger in diameter [and] it is hard and swollen and bright red." *Id.* at 550. Treatment notes dated March 16, 2009, indicate that Plaintiff was experiencing "hot reddened right lower leg." *Id.* at 566. On

---

[1] The page number refers to the Bates numbers printed in the lower right hand corner of this exhibit.

[2] Cellulitis is a potentially deadly skin infection caused by bacteria which "can spread to the blood or lymph nodes." *See* Cellulitis, available at http://www.webmd.com/skin-problems-and-treatments/tc/cellulitis-topic-overview (last viewed on Feb. 15, 2011). If not treated promptly, cellulitis "can spread quickly through the body and cause sepsis." Cellulitis can also cause "blood clots in the legs." *Id.*

March 17, 2009, Plaintiff reported that he was experiencing increased pain in his right lower extremity. *Id.* at 573. An examination revealed that Plaintiff's right leg was even more "swollen red and painful," at which point Plaintiff was taken to the emergency room. *Id.* In a treatment note completed later that day, a doctor reported that Plaintiff's "leg is felt to be in danger of complete vascular failure and I worry that a clot. . .may break free to cause a fatal pulmonary embolus." *Id.* at 575. Plaintiff was subsequently diagnosed with deep venous thrombosis (DVT) "with severe venous damage." *Id.* at 584.

On March 24, 2009, Dr. Marquart canceled Plaintiff's back surgery (scheduled for March 26, 2009) "due to recent hospitalizations and repeated trips to ER for cellulitis/deep vein thrombosis." *Id.* at 597. Dr. Marquart requested that Plaintiff's surgery be rescheduled once his cellulitis "is better/healed." *Id.*

On April 10, 2009, Plaintiff was transported to the emergency room after experiencing "severe pain" and "severe swelling" in both lower extremities. *Id.* at 620. Plaintiff participated in a venous doppler examination, the results of which revealed "chronic DVT." *Id.* at 660. On April 15, 2009, Plaintiff reported that he was experiencing right groin pain and swelling in both lower extremities. *Id.* at 628. Treatment notes dated May 3, 2009, indicate that Plaintiff's right lower extremity was "swollen, inflamed and very painful." *Id.* at 669. Plaintiff was diagnosed with "acute cellulitis." *Id.*

Treatment notes dated May 11, 2009, indicate that Plaintiff's back surgery "is presently on hold" as a result of his recent lower extremity difficulties. *Id.* at 660. On May 13, 2009, Plaintiff was taken to an emergency room after he began experiencing pain and swelling in his right lower extremity. *Id.* at 663-68. On May 28, 2009, Plaintiff reported that he was experiencing "increased" pain and swelling in his right groin and lower extremity. *Id.* at 697.

On June 2, 2009, Plaintiff reported to Health Services. *Id.* at 715. Plaintiff reported that he was experiencing "severe back pain" for which he requested "a pain shot." Plaintiff became upset when a nurse attempted to take his blood pressure, stating "you either call [the hospital] and get me an order for a pain shot, and if you are not going to do that than you send me out to the hospital now." When Plaintiff's demands were not satisfied, he "took off the blood pressure cuff" and "threw it at" the nurse striking her "square in the chest." Plaintiff then stated that he was refusing treatment and departed. The nurse observed that Plaintiff "was walking very well, no guarding he was walking fast, and he showed no signs of pain as he left." *Id.*

On June 24, 2009, Plaintiff was examined by Defendant Holmes. *Id.* at 730-31. Plaintiff reported that he was experiencing lower back pain which he rated as 6 on a scale of 1-10. *Id.* at 730. Claiming that his current pain medication "doesn't do anything," Plaintiff requested "more Vicodin." *Id.* Plaintiff walked with a normal gait and was "able to get up very quickly from sitting on the bench to normal stride." *Id.* at 731. Plaintiff exhibited "normal" heel and toe stance and straight leg raising was negative. *Id.* In an affidavit, Defendant Holmes further states that "Plaintiff's current chronic pain did not necessarily correspond with the results identified by the MRI taken in 2008 and it was not clear to me that an operation would resolve his current pain." (Dkt. #28, Exhibit B).

On June 27, 2009, Plaintiff was taken to the hospital for treatment of cellulitis in the left groin area. (Dkt. #28, Exhibit D at 734-35).

On July 21, 2009, Plaintiff was examined by Defendant Hammond. *Id.* at 755-56. Plaintiff stated that "he now wants the back surgery." *Id.* at 755. Hammond observed that Plaintiff "ambulates well" and "walk[s] at a brisk gait." She further observed that Plaintiff "is able to get on the exam table with ease." Plaintiff then "walked out before rest of exam could be completed." *Id.*

Treatment notes dated August 8, 2009, indicate that Plaintiff was experiencing redness and swelling of his left groin area. *Id.* at 764. Treatment notes dated August 11, 2009, indicate that Plaintiff was experiencing cellulitis of the left lower extremity. *Id.* at 766.

On or about October 1, 2009, Defendant Holmes requested that an "outside consultant" determine whether "surgery was still indicated" for Plaintiff. (Dkt. #28, Exhibit B; Dkt. #28, Exhibit D at 796-97). On October 5, 2009, Defendant Squier denied Plaintiff's request for back surgery. (Dkt. #28, Exhibit A; Dkt. #28, Exhibit D at 800). Dr. Squier concluded that "the objective indications for such surgery were not present." (Dkt. #28, Exhibit A; Dkt. #28, Exhibit D at 800). Specifically, the doctor observed that Plaintiff "has no functional difficulties, he walks without a limp, has no local neuro signs or deficits, [and] climbs on [and] off exam table without difficulty." (Dkt. #28, Exhibit D at 800). In an affidavit, Dr. Squier further observed that:

> The protocol for this kind of spinal surgery is that there should be verified evidence of neurological deficits or dysfunction. The recent examinations of Plaintiff did not warrant surgery, especially in light of the risks associated with his recurring lymphedema and cellulitis. It was my medical judgment that consultation for surgery for Plaintiff's back was not indicated by the medical record. Denial of a surgery consult under these facts is a medical judgment consistent with standards in the field practiced by other practitioners. I did note that the medical providers could consider repeating a full examination, but that surgery was not indicated unless neurological dysfunction was documented. I based my denial of the consultation request on my review of the medical file and the observations of the medical personnel who had examined Plaintiff.

(Dkt. #28, Exhibit A).

With respect to Defendant Squier's conclusion, Defendant Holmes asserts in his affidavit that "the appropriateness of surgery to relieve Plaintiff's back pain is debatable for many reasons." (Dkt. #28, Exhibit B). As the doctor observed, Plaintiff "is highly functional with respect to his daily

activities." The doctor further observed that Plaintiff's "complaints of June through October 2009 were not necessarily consistent with the previous MRI results from September 2008." Dr. Holmes further observed that Plaintiff's "previously scheduled surgery did not occur and yet [Plaintiff] was not showing significant deterioration in function or exhibiting evidence of nerve damage." *Id.*

On October 14, 2009, Plaintiff met with Defendant Hammond. (Dkt. #28, Exhibit D at 803). Plaintiff entered and "sat on the treatment table." When Plaintiff was informed that his surgery request had been denied, he "got up off the exam table very swiftly and walked out of the clinic with a[n] upright gait and swift pace." Plaintiff terminated his visit before Hammond could examine him. *Id.* On October 23, 2009, Plaintiff reported to a care provider, "I'm doing fine. I don't have any problems. I'm good." *Id.* at 809. On November 17, 2009, Plaintiff requested that he be permitted to participate in physical therapy. *Id.* at 830.

On January 19, 2010, Plaintiff reported that his cellulitis was "worsening - going up his entire left leg as well as groin, abdomen, neck and face." *Id.* at 849. An examination revealed that Plaintiff's left lower extremity was "severely swollen, red, hot - toes are blue and cold, unable to feel pulse in the extremity." Plaintiff was transported to the emergency room for treatment. *Id.*

The Court again notes that Plaintiff's claim is not that he was denied treatment altogether, but that he was denied the specific treatment (back surgery) that he desired. As the evidence makes clear, however, Plaintiff's claim is based on nothing more than his personal disagreement with the decision to not reschedule his back surgery. In this respect, the Court notes that the evidence of record reveals that neither Defendant Hammond nor Defendant Holmes were involved in the decision to deny Plaintiff's surgery request. Accordingly, the undersigned recommends that Defendants Holmes and Hammond are entitled to summary judgment. *See, e.g., Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir.

1999) (liability is not to be found in passive behavior or an alleged failure to act, rather liability must be based upon "active unconstitutional behavior"). Even if this rationale is rejected, Defendants Holmes and Hammond are entitled to summary judgment on the same ground as Defendant Squier, namely that the basis for Plaintiff's claim is nothing more than his disagreement with his care provider's treatment decisions.

As noted above, Defendant Squier denied Plaintiff's request for back surgery on the ground that "the objective indications for such surgery were not present." As the doctor reported, Plaintiff exhibited "no functional difficulties." This conclusion is supported by the evidence and Plaintiff offers no evidence to the contrary. Dr. Squier further observed that surgery was not warranted "in light of the risks associated with [Plaintiff's] recurring lymphedema and cellulitis." The evidence reveals that Plaintiff experienced severe bouts of edema and cellulitis in his lower extremities and Plaintiff offers no evidence calling into doubt the wisdom or sincerity of Dr. Squier's judgment on this point. In short, Dr. Squier's decision is amply supported by the evidence of record. Moreover, Plaintiff has submitted no evidence calling into question Dr. Squier's assertion that her decision to deny his surgery request was based on anything other than an appropriate exercise of her medical judgment. While Plaintiff disagrees with the doctor's decision, and may even find that such constitutes malpractice, such cannot form the basis for a claim under the Eighth Amendment. Accordingly, the undersigned recommends that Defendants are entitled to summary judgment.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that <u>PHS Defendants' Motion for Summary Judgment</u>, (dkt. #28), be **granted** and this matter terminated. The undersigned

further recommends that appeal of this matter would not be taken in good faith. *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997); 28 U.S.C. § 1915(a)(3).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: April 13, 2011

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge